IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2025

## IN RE JAYLYNN J.

**Appeal from the Juvenile Court for Davidson County**
**No. PT000272009   Sheila Calloway, Judge**

_____

### No. M2024-01688-COA-R3-PT

_____

In the first appeal of this parental termination case, we affirmed the trial court's findings that three grounds for termination were sufficiently proven, but we vacated one ground and the trial court's best interest determination due to insufficient findings in the termination order. On remand, the trial court entered an amended order containing additional findings. The mother appeals. We affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN, JJ., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Heather F.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Jaylynn J. was born in 2018 to Heather F. ("Mother").[1] In 2020, when Jaylynn was two, she was placed in temporary custody of the Tennessee Department of Children's Services due to drug abuse by Mother. Jaylynn was ultimately adjudicated dependent and neglected due to Mother's continued use of drugs. The order adjudicating her dependent and neglected states that Mother admitted to substance abuse throughout the proceeding and tested positive for illegal substances throughout the proceeding. Mother was referred

_____

[1] We refer to the parties by initials to protect the privacy of the minor child.

to family treatment court, but she was not participatory and failed to comply with its requirements. DCS developed several permanency plans for Mother. However, she continued to test positive on DCS drug screens. After some initial placements in other homes, Jaylynn was placed in a foster home with her current foster parents in March 2021, at the age of three.

In March 2022, Mother had a visit with Jaylynn and was drug screened, and she tested positive for eleven substances: amphetamine, barbiturates, bupronephrine (Suboxone/Subutex), cocaine, ecstasy, methamphetamine, opiate, oxycodone, PCP, propoxyphene, and THC. In June 2022, Mother was arrested and went to jail, charged with two counts of assault and one count of burglary. She ultimately pled guilty to the two assaults and a lesser offense of theft. In September 2022, while Mother remained in jail, DCS filed a petition to terminate parental rights.[2] The petition asserted that termination of Mother's parental rights was warranted based on five grounds for termination: abandonment by an incarcerated parent, abandonment by failure to provide a suitable home, substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. The petition also alleged that termination was in the best interest of Jaylynn.

The matter was tried on April 17, 2023. By that time, Jaylynn was five years old. She had not been in Mother's custody since April 2020, when she was initially placed with a relative. The trial court heard testimony from Mother, the child's maternal grandmother, the foster mother, and a DCS caseworker. Mother testified first. She had been released from jail just two months before trial, on February 10, 2023, after serving seven months. Mother acknowledged that Jaylynn had been in foster care with DCS for two and a half years, roughly half of her life. Mother explained that Jaylynn was removed from her custody because she tested positive for heroin on a drug screen. She testified that she was living with her grandmother at the time. Mother testified that she had only been an active drug user for a couple of months at the time of Jaylynn's removal, but her primary drug was heroin. Mother testified that she could not recall ever missing any DCS drug screens or any visits with Jaylynn. However, Mother admitted that she had never been clean on a DCS drug screen. She had tested positive for a host of drugs, including heroin, Xanax, morphine, cocaine, meth, ecstasy, and many others.

Mother described the circumstances surrounding her arrest in June 2022. She stated that she was involved in an incident with neighbors in which she was accused of a physical altercation and going into their shed and taking something. Mother conceded that she was an active drug user at the time and still using heroin. In fact, Mother admitted that she had used drugs continuously from the time Jaylynn was removed in 2020 until Mother went to jail in June 2022. She said she went to a detox program three times during that period, for

---

[2] The trial court ultimately terminated the parental rights of Jaylynn's father as well, and he did not appeal that decision.

five to seven days each time. However, the programs recommended that she attend thirty-day treatment programs thereafter, and she never completed those before she went to jail.

Mother testified that in connection with her arrest and guilty plea, she was placed on two years of supervised probation and ordered by the court to attend a thirty-day rehab program at Buffalo Valley Substance Abuse Treatment Facility. Thus, within days of her release from jail, Mother had entered Buffalo Valley for "Residential/IOP" treatment, and she remained there from February 16 until March 24, 2023. Mother testified that she successfully completed the thirty-five-day program. However, she admitted that she had never entered any inpatient treatment until it was a requirement of her probation.

The Buffalo Valley program had issued a "Continuing Care Plan" with steps for Mother to take, including securing "supportive housing," and it stated that Mother planned to reside at Restoration House in Nashville for "transitional living." Mother testified she had entered a six-month halfway house program at Restoration House after leaving Buffalo Valley. She testified that visits could be approved for children at Restoration House, but Jaylynn could not live there. Mother testified that the six-month halfway house program had three phases with various restrictions in place. However, Mother had only been at the halfway house for three weeks and was still in phase one. Mother testified that she knew the program was important and planned to complete it and then use the tools she was learning to succeed in the real world. Mother testified that she had no concerns about maintaining her sobriety. She testified that she had passed drug screens upon entering Buffalo Valley and on four occasions while at Restoration House so far. She also testified that completing the six-month program would give her time to save up some money for an apartment or something so that she would have somewhere to go afterward. Mother conceded that she currently had "nowhere to go as it stands right now" other than the halfway-house. Mother testified that her grandmother had passed away while she was incarcerated, and she had no concrete plan for housing.

Mother was asked about her visits with Jaylynn before she went to jail in June 2022. She recalled visiting Jaylynn once in March 2022, and she thought that she had also visited once in February 2022. When asked why she didn't visit more often, Mother said she had problems with the DCS caseworker canceling or not showing up, but when asked if she could recall any specific instances of this happening, she could not. By the time of trial, Mother had not seen Jaylynn in over a year, since the March 2022 visit when she tested positive for multiple drugs.

As for employment, Mother testified that she had not been employed throughout the time that Jaylynn had been in foster care. She testified that she "got depressed" from "losing [Jaylynn]." Mother testified that she had a few jobs "on and off" but that they "just didn't stick" due to her drug use. She explained that she "just didn't go to work." Mother testified that she did not have any bills at the time because she was living with her grandmother. She testified that her grandmother provided all of her basic necessities other

than her food, and she was on food stamps. She explained that her grandmother also gave her money every week, and Mother admittedly used that money to buy drugs. Mother acknowledged that she was aware she was supposed to be paying child support. She testified that she took some food to Jaylynn and sometimes gave $30 or $40 to the relatives who initially cared for Jaylynn before she was placed in DCS custody. However, when asked about the first half of 2022, before Mother went to jail, Mother admitted that she did not provide any support to Jaylynn's current foster home.

Mother testified that she had just recently obtained "a transitional job" working through Project Return, which she described as a program that places individuals in jobs after release, where they eventually get hired "permanently-ish." However, Mother had only been working at this job since April 5, twelve days before trial. The program would help Mother with transportation to and from work for ninety days, after which she would be on her own. Mother did not have a car and testified that she does not drive, but she had plans to obtain her driver's license. Her current method of transportation was the bus. When asked if she had ever had a full-time job, Mother testified that she had been working as a hotel housekeeper when Jaylynn was removed, but she quit that job when she lost Jaylynn.

Even though Jaylynn had been in her current foster home for fifteen months before Mother went to jail, Mother admitted that she did not make progress on her permanency plan requirements until after she went to jail. In 2020, she had been offered a chance to participate in family treatment court, but the opportunity eventually ended because she did not comply with its requirements. Mother said that she had never before allowed herself to work through what she needed to work on, but sitting in jail for seven months gave her time to think about things and "get in a better head space." Mother said she had "a pretty bad addiction" and needed that time in jail to get clean. Mother testified that DCS had not helped her at all throughout this process and that she had a lot of different caseworkers. She testified that she had various persons in jail and at Buffalo Valley who attempted to contact DCS on her behalf but were unsuccessful. She had spoken with her DCS caseworker about setting up a visit after she was released from jail, but she testified that he did not get back to her after that. Mother acknowledged that her phone number had changed at least five times while Jaylynn was in custody, but she said that her grandmother's landline phone had remained the same.

Mother admitted she knew it was not appropriate for a child to remain with her when she was an active heroin user. She also admitted that she knew going to jail would greatly impact her ability to reunify with Jaylynn. When asked why she didn't make efforts to stay out of trouble, Mother said she did not know. When asked why she did not attempt to become drug free prior to going to jail, Mother said she did but "[i]t's just harder than it sounds." When asked why the court should consider returning Jaylynn to her, Mother testified that she was at the point where she was ready to have a life with her daughter in it. She said her goal was "to get to where she can come around." Mother testified that she

- 4 -

just did not want to lose Jaylynn, as she was her only child and all she had. Mother testified that she knew she had messed up a lot, but she was not ready to give up. Mother candidly admitted that she still did not have it together right now, but she said she believed she could. Even though Jaylynn could not come to live with her immediately, Mother believed it would not be much longer until she could. When asked to estimate a timeframe for this to be possible, Mother said it would be at least six more months. Mother estimated that it would take her seven to eight months to obtain stable housing and employment. Still, Mother believed that Jaylynn would be better off "with her mom." At the same time, she agreed that she was unable to give her the home she needs right now. She said she was working hard to get on her feet and change her life for the better so she could be there for her daughter.

The next witness to testify was the foster mother. Jaylynn had been living in her home since March 2021, two years prior to trial. The foster mother testified that Jaylynn was placed in another home before hers. She testified that Jaylynn initially had several behavioral issues and was very easily angered, and she would throw temper tantrums, spit, and bite. She was three years old at the time and had been in foster care for about six months. The foster mother testified that Jaylynn started behavioral therapy pretty quickly, within a month of being placed in her home, and she remained in that therapy at the time of trial two years later. The foster mother testified that Jaylynn's therapist reported she had been very successful. The foster mother had also observed that Jaylynn had become a lot more secure in herself, less frustrated, and able to articulate her thoughts about what she wanted "instead of fighting for it." She had not seen any biting in over nine months, and very rarely did Jaylynn have a "come-apart" temper tantrum. She said her behavior now is more in line with a normal five-year-old. The foster mother testified that Jaylynn was also attending speech therapy twice per week because she had a little bit of a tongue-tie, but the doctor recommended speech therapy rather than surgery. Jaylynn was also very delayed in potty training and was not fully potty trained until she had been in the home for a year and was nearly five years old. She had night terrors about every two weeks when she first came to the home, but those had decreased to maybe one every three months.

The foster mother testified that Jaylynn was her first and only foster child. However, she and her husband had three older children who were ages ten and above. Jaylynn had bonded with them and treated them as siblings. Jaylynn sometimes talked about her biological parents, but she referred to her foster parents as "Mama" and "Daddy." The foster mother testified that the home was preadoptive and that they would like to adopt Jaylynn if possible. Jaylynn attended preschool two days per week and was excited to begin kindergarten in the fall. Aside from one "tussle" with another student right after she was placed in the home, Jaylynn had no behavioral issues at school and was thriving. The foster mother testified that Jaylynn thrived on having a structured environment and knowing her routine, as this made her feel secure. She testified that Jaylynn had experienced two stable years with them and believed that knowing she had permanency with them would be positive for her. The foster mother explained that Jaylynn sometimes

asked questions about her future and whether she would be staying with them and going to school where her other children attend. She also testified that Jaylynn had struggled with some separation anxiety, which she had experienced from the time she was placed in the home and continued through the time of trial. She explained that Jaylynn will call out her name or say "I love you" just to make sure she is still nearby in their home, as if she has a fear of being left. She said Jaylynn wants to make sure she is with someone.

The foster mother only recalled one or two visits between Mother and Jaylynn in 2022, the year when Mother went to jail. Her notes from that time period indicated that Mother failed to show up for a visit on February 18, 2022, even though the case manager picked up Jaylynn and took her to the visit. The only other visit mentioned in her notes was on March 29, 2022, when Mother tested positive for various substances.

The trial court also heard testimony from Latrecia Morris-Clay, the DCS team leader for foster care and current family service worker for Jaylynn's case. Ms. Morris-Clay had only been assigned to the case as family service worker since March 2, about a month before trial, but she had supervised the case for twenty-one months prior. She had reviewed Jaylynn's file in its entirety.

Ms. Morris-Clay testified that DCS set up phone call visits for Mother and Jaylynn in late 2020 and early 2021 that were supposed to occur twice per week. However, the case worker's notes from the dates of the first twelve telephone visits stated that Mother did not participate. Thereafter, the case manager recorded that he or she had not been able to contact Mother in a few weeks, Mother's phone had been disconnected, and the case manager had reached out to her attorney. The case manager's notes also indicated that Mother failed to appear for several drug screens during this same time period.

For 2022, DCS records indicated that Jaylynn's caseworker took her to a scheduled visit with Mother on February 18 and waited thirty minutes, but Mother did not show. The only visit reflected in the records during the months prior to the filing of the termination petition was on March 29, when she tested positive on the drug screen. Ms. Morris-Clay also testified that no support was paid by Mother during this timeframe or at any other point since Jaylynn entered foster care. Ms. Morris-Clay testified that incarceration prohibits DCS from working toward reunification expeditiously because it typically does not have young children visiting jails, and the parent cannot work on services to the same extent.

Ms. Morris-Clay testified as to numerous notes in the file regarding the case workers' attempts to communicate with Mother regarding scheduling assessments, drug screens, phone visits, etc. She was unaware that Mother had completed any detox or entered the half-way house until she heard Mother's testimony at trial. Ms. Morris-Clay testified that she never had any voicemails from Mother and would have returned her calls if she did. She was not aware that Mother had been released from jail until a week before

trial.

Ms. Morris-Clay testified that Mother failed to comply with the permanency plans established for her, as she never paid child support, failed to follow any recommendations of an alcohol and drug assessment, sporadically submitted to drug screens and tested positive, failed to complete her parenting assessment, did not visit regularly, did not obtain stable housing, and did not establish an income. Ms. Morris-Clay deemed Mother's substance abuse issues as the most important, and given Mother's history, she was concerned that Mother would relapse. She also noted that Jaylynn had already been in foster care for two and a half years, and by Mother's best estimation, it will be at least another six months before she could exit the halfway house and care for Jaylynn. In contrast, Ms. Morris-Clay believed that Jaylynn could achieve permanency very quickly with her foster parents. She noted that Jaylynn, at five years old, had already been in the home for over two years. She had observed Jaylynn there and described her as bubbly, friendly, and talkative, but "clingy" to the foster mother. She testified that Jaylynn's behavior and speech had improved, and she believed that a change of caretakers would be detrimental.

Mother's mother testified briefly in rebuttal as to very limited subjects. The trial court then took the matter under advisement. Two months later, on June 16, 2023, the trial court entered a final order terminating the parental rights of both parents. The trial court found that all five grounds asserted against Mother had been proven by clear and convincing evidence -- abandonment by an incarcerated parent, abandonment by failure to provide a suitable home, substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. The trial court also found that termination was in the best interest of Jaylynn.

On August 8, 2023, Mother filed a Rule 60 motion, asking the trial court to withdraw and re-enter the termination order of June 16 in order to permit her to timely file a notice of appeal. The motion asserted that Mother's attorney had inadvertently overlooked the email notification of the entry of the order when it was served upon counsel through the efile email notification system. Thus, according to the motion, counsel did not become aware of the entry of the order and notify Mother until the thirty-day appeal period had run. On September 25, 2023, the trial court entered an amended final order, purporting to "correct the date of filing from the clerk and the Judicial signature." On October 24, 2023, Mother filed her initial notice of appeal to this Court.

On June 11, 2024, this Court issued its decision resolving Mother's first appeal in *In re Jaylynn J.*, No. M2023-01496-COA-R3-PT, 2024 WL 2933349 (Tenn. Ct. App. June 11, 2024). DCS did not defend the ground of abandonment by an incarcerated parent, "as the basis for the trial court's ruling [was] unclear." Aside from summarizing the statutory text, the order simply stated, "In this case, Mother was incarcerated from June 2022 to February 10, 2023. She was incarcerated on two assault charges and a theft charge which

was amended from the original charge of Burglary. Clearly, the Court finds that Mother abandoned the child by her incarceration as according to the statute." We therefore reversed the trial court's finding of abandonment by an incarcerated parent. 2024 WL 2933349, at *6. Considering the remaining four grounds, we affirmed the trial court's conclusion that three grounds for termination were sufficiently proven – substantial noncompliance, persistent conditions, and failure to manifest a willingness and ability to parent. *Id.* at *6. The last remaining ground – abandonment by failure to establish a suitable home – we vacated due to insufficient findings by the trial court. *Id.* at *12. We also vacated the trial court's best interest determination due to insufficient findings by the trial court and remanded with instructions for the trial court to consider all of the relevant best interest factors and detail its findings. *Id.* at *16. The trial court's original best interest analysis only mentioned six of the twenty statutory factors for consideration, and two of those six factors were analyzed with only a single sentence.

On remand, the trial court entered a second amended final order terminating Mother's parental rights, on October 8, 2024. Mother then filed a second notice of appeal to this Court.

## II.  ISSUES PRESENTED

Mother presents the following issues for review on appeal:

1.     Whether the trial court erred when it found by clear and convincing evidence that Mother abandoned Jaylynn by failing to establish a suitable home; and
2.     Whether the trial court erred when it found that termination of parental rights was in the best interest of Jaylynn.

For the following reasons, we affirm the termination of parental rights.

## III.  STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

"In Tennessee, proceedings to terminate parental rights are governed by statute." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023) (citing *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015)). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455

S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.* Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. GROUNDS FOR TERMINATION

Mother's first issue is whether the trial court erred by finding the ground of abandonment by failure to establish a suitable home. However, DCS states in its brief that this Court vacated this ground in the first appeal, and the trial court made no finding regarding this ground on remand as it relates to Mother. The record supports DCS's assertion. The trial court's second amended order, entered on remand, stated that "[t]he Court of Appeals has vacated the ground of failure to establish a suitable home as to Mother." The section of the order addressing this ground still included findings as to Father, but it made no findings as to Mother. The conclusion of the order simply states that "[Father] has failed to provide a suitable home for the child . . . ." Thus, we agree with DCS that this ground for termination was not found as to Mother and is not at issue on appeal. Because this Court previously affirmed the trial court's findings that three grounds for termination were sufficiently proven, we proceed to the best interest analysis.

## V. BEST INTEREST

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). Tennessee Code Annotated section 36-1-113(i) provides, in pertinent part:

- 9 -

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the

circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

According to the Tennessee Supreme Court:

When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child...." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each

- 11 -

statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d at 681-82.

Regarding factor (A), the effect that termination would have on the child's critical need for stability and continuity of placement throughout minority, the trial court found that Jaylynn "has a critical need for stability and continuity of placement through her minority," and Mother has "not demonstrated an understanding of the need for stability and continuity." The record supports these findings. Mother argues on appeal that terminating her parental rights "would be a disservice to Jaylynn to cut off a possible placement option with her Mother." However, by the time of trial, Jaylynn had already been in foster care for over two and a half years, at the age of five, and Mother admitted that she would not be able to complete the halfway house, obtain some type of housing, and secure employment to enable her to care for Jaylynn for at least six to eight more months. Accordingly, termination of Mother's parental rights would provide Jaylynn with the opportunity to achieve stability and continuity of placement in the home where she had already resided for two years at the time of trial. That is not a disservice to Jaylynn.

Regarding factor (B), the effect that changing caretakers and physical environment would have on the child's emotional, psychological, and medical condition, the trial court found that changing caretakers and physical environment would be likely to have a negative effect on Jaylynn's condition. The trial court noted that Jaylynn had lived in the foster home since March 2021, and when she first arrived at the home, she had separation anxiety and many behavioral issues. It found that the foster parents had ensured that Jaylynn received behavioral therapy, along with providing for all her needs. Thus, the trial court found that a change in caretakers and environment would have a negative effect on her emotional and psychological conditions. The record supports these findings.

As for factor (C), whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs, the trial court

found that Mother failed to demonstrate continuity and stability in meeting Jaylynn's needs. It found that Mother had not shown the ability to take care of her own needs, much less the child's.

The next factor, (D), is whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment. The trial court found that Mother and Jaylynn did not have a secure and healthy parental attachment, and there was no reasonable expectation that they could create one. The court found that Mother was incarcerated from June 2022 until February 2023, and she no longer has an attachment with Jaylynn. Mother argues on appeal that "prior to the Mother's incarceration in 2022, she had a strong bond with Jaylynn[.]" However, Mother only had one or possibly two visits with Jaylynn during the six-month period prior to her incarceration, and by the time of trial, they had not visited in over a year. Thus, the record supports the trial court's finding that Mother and Jaylynn no longer have a secure and healthy parental attachment, and there is no reasonable expectation that they could create one.

Factor (E) relates to visitation. The trial court found that Mother failed to maintain regular visitation or any other contact with Jaylynn and failed to use the visits or contact she did have to cultivate a positive relationship with her. The record supports this finding. Mother's last visit with Jaylynn was over a year before trial, and she tested positive for eleven substances that day.

The trial court made no finding regarding factors (F) and (G). Factor (H) relates to the existence of a healthy parental attachment between the child and another person or persons in the absence of the parent. Factor (I) is whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships. The trial court found that Jaylynn had created a healthy parental attachment with the current foster parents, with whom she has lived since 2021. The court found that Jaylynn calls them "Mama" and "Daddy." The trial court also noted that Jaylynn has foster siblings in the home with her, and they love her and treat her as their sibling.

Factor (J) is whether the parent has demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner. The trial court found that Mother failed to demonstrate a lasting adjustment of circumstances to make if safe for Jaylynn to be in the home. It noted that Mother is currently in a halfway-house, and she has not completely addressed the circumstances that led to Jaylynn being placed in DCS custody. The trial court found that Mother has continued to have issues with illegal drug use, rendering her unable to

consistently care for Jaylynn. The trial court recognized that at the time of trial Mother had not used illegal substances recently due to her time in jail and the halfway house, but it found that her history of drug use inhibited her ability to keep the child in a safe and stable manner. We agree with these findings. For too long, Mother chose drugs over the chance to regain custody of Jaylynn. She had not demonstrated a lasting adjustment of her circumstances even after two and a half of years of foster care for Jaylynn.

Factors (K) and (L) require an examination of whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions, and whether DCS made reasonable efforts to assist the parent in making a lasting adjustment. The trial court found that Mother failed to take advantage of available programs and resources to assist in making a lasting adjustment of her circumstances, particularly as it related to her illegal substance abuse. The trial court acknowledged that Mother completed treatment, but it found that she still lacked any plan for housing once she leaves the halfway house. The record again supports these findings. On a related note, Factor (M) is whether the parent has demonstrated a sense of urgency in seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest. Regarding this factor, the trial court found that Mother failed to demonstrate any sense of urgency in seeking custody of Jaylynn. It found that Jaylynn had been out of Mother's custody since she was two years old, and she was five years old at the time of the hearing. We agree with the trial court's findings. Mother argues on appeal that she "has remained focused on working on herself to become a better parent for Jaylynn." However, Mother admitted at trial that she did not make progress toward completing the tasks necessary to regain custody until she was arrested and went to jail, and the court ordered that she attend treatment as a condition of her probation. During the first year that Jaylynn was placed in her current foster home, Mother continued to use all kinds of drugs, refused to attend the necessary treatment, and failed to secure employment. Even though she had no bills to pay, she used the money she received from her grandmother every week to buy more drugs. At the time of trial, Mother had only been at the halfway house for three weeks and was still in phase one of the program, and she had only been working at a transitional job for twelve days. She certainly did not demonstrate any sense of urgency.

Factor (P) asks whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive. The trial court found that Mother has not demonstrated such an understanding. Factor (Q) is whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. The trial court found that Mother had not. Factor (S) is whether the parent has consistently provided more than token financial support for the child. The trial court found that Mother failed to consistently provide any financial support for Jaylynn. The trial court made no finding as to factors (N), (O), (R) and (T).

- 14 -

In summary, the trial court reiterated that Mother is still residing in a halfway house and attempting to work on her sobriety. The trial court recognized that this is an important step for Mother, but sadly, it found no proof to show that her sobriety will continue once she has completed the program. The trial court also found that Mother has "no plans for her future" once she is released from the halfway house. In contrast, the trial court found that Jaylynn is placed in a preadoptive home and is developing strong bonds with her foster parents and foster siblings. Thus, the trial court found that it is in Jaylynn's best interest for Mother's rights to be terminated. We agree. Mother asks this Court to consider that she was working hard to get on her feet and change her life for the better, and we have no doubt that she was. However, the fact remains that she had only just begun the halfway house program by the time of trial, lacked any housing or long-term employment, had not demonstrated that she could maintain her sobriety outside of a facility, and was still unable to provide Jaylynn with a safe and stable home.

Having carefully reviewed the entire record, we conclude that the proof does not preponderate against the trial court's factual findings, and we conclude that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in the best interest of Jaylynn. *See In re Neveah M.*, 614 S.W.3d 659, 680 (Tenn. 2020). Considering the best interest of Jaylynn, from her perspective, it is clear that termination of parental rights is in her best interest.

## VI. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is affirmed. Costs of this appeal are taxed to the appellant, Heather F., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

- 15 -